Good morning, Your Honors. May it please the Court, my name is Mindy Reynolds, and I am here on behalf of Luis Maurilio de Souza. I would like to reserve three minutes for rebuttal. The first issue in this case is the Convention Against Torture issue. Specifically, this case resolves around the correct interpretation and application of Zhang v. Ashcroft. In Zhang, this Court adopted a particular understanding and meaning of the term acquiescence as it appears in the regulations implementing the Convention Against Torture. Specifically, the Zhang Court rejected the BIA precedent regarding a high degree of knowledge and participation by government officials in order to constitute acquiescence. In this case, the IJ has essentially revived the pre-Zhang standard. Indeed, the IJ's oral decision is nearly a paraphrase of the pre-Zhang oral decision matter of SV. Essentially, Your Honors, this case is one of those cases where although it appears that the IJ may have been aware of Zhang as they paid lip service to the word woeful blindness and mentioned it in the decision, the immigration judge plainly did not faithfully apply the Zhang standard because in the very next sentence, the IJ stated it believed the cat required a public official to specifically acquiesce to the torture of Mr. de Souza and demonstrate a willful blindness to the fact that he, Mr. de Souza, would be tortured. Clearly, the immigration judge thought it was necessary for the Brazilian government to be aware of Mr. de Souza's personal circumstances and essentially turn a willful blind eye to the fact that he personally would be tortured. And that is not what Zhang says, Your Honors. Did you represent the Petitioner before the immigration judge? No, Your Honor. I always check before I look at one of these cases at the statistics about an immigration judge, and this is interesting. This is Judge King. Yes, Your Honor. She, isn't it? Yes, Your Honor. Her denial rate is about 30 percent. The national rate is 61 percent. In San Francisco, it's 50 percent. So this is not an anti-asylee, anti-cat, anti-withholding immigration judge. You know, Your Honor, in my appeal before the BIA, we discussed ineffective assistance of counsel, which is barred for us to argue before this Court. But there were some other issues that we believe, we can't argue the one-year bar issue here as well, but that was an issue that was caused by prior counsel. And we actually filed a Lusada complaint against the previous counsel before the BIA. So... Well, when I hear you argue that the immigration judge turned a blind eye... Right. That might make more sense where you had a judge who routinely denied asylee and cat claims. I just wonder how it fits here. You know, I don't know exactly, but the IJ clearly did not apply the Ninth Circus decision in Zhang in this matter. It's very clear that this case is actually pretty factually similar to Zhang. And I think it was because of the ineffective assistance of the trial counsel. The petitioner was smuggling drugs, right? No, my petitioner was not smuggling drugs. My petitioner has no crime. Actually, my petitioner was being smuggled. He was entering the United States, Your Honor. He was being smuggled in. Yeah, he was a victim of the smugglers. So he was not smuggling anything. And when he was caught, he offered to testify against him? He testified against. And actually, he probably would have been eligible for a U visa if his attorney at the time had asked for help from the government, you know, in exchange for his testimony against the smugglers. But his attorney at the time didn't. So he offered testimony to the U.S. government officials against the smugglers based on part because of his political opinion. Did the immigration judge get to whether the feared persecution or torture was because of what your client had done? Yes, Your Honor. And that's another issue in this matter. The second issue in your case, Your Honor, is not a purely legal issue, but it's a question of substantial evidence. And even though the IG didn't dispute that Mr. DeSouza holds firm and genuine political beliefs with regard to the human smuggling trade, and she very specifically found his testimony to be credible, and he conveyed his political beliefs, and those beliefs in part induced him to cooperate with the U.S. authorities, the immigration judge said that she felt that the torture would be based only on revenge. But if Mr. DeSouza had not expressed his political opinion, which is that he has a political opinion against the smugglers, then he would not have been persecuted. As such, it's our position that Mr. DeSouza's personal belief and his expression of those being persecuted based on behalf of that political belief. We think it's a very clear example of someone who's facing dire consequences because he held and acted upon those reliefs by cooperating with the U.S. government in offering testimony against the smugglers. Good. If we adopt your theory of this case, could any person smuggled in from, say, Mexico or Guatemala? Your Honor. Can I finish my question? Could any person smuggled in, individual smuggled in, testify against the coyotes who brought them here and achieve cap protection? I don't think so, Your Honor, because this person has been specifically threatened in their country. He has been specifically threatened, and he has proven a high probability of the fact that he were to be forced to return to Brazil. So it's – You don't think Poyos smuggled in by coyotes from Mexico who testified against their smugglers would not be similarly subject? Not necessarily, Your Honor. I believe that this case is very particular, and I believe that the amount of testimony that he offered was extensive, and the support that he gave to the government was much more than usual, Your Honor. And the third issue in this case, which we believe is also very important, is, you know, as informers, as a social group, and we would like to offer this argument. We've gone into a lot of detail on that. Before you get there, tell me why that's a political opinion, if you testify against a smuggler. It's – I believe the definition of the social group, Your Honor, is one united by voluntary association. No, no, no. Before you get there, I said tell me why it's a political opinion to be an informant against a smuggler. Well, that human smuggling and the mistreatment of victims is – is incorrect, and that – If it's an opinion, why is it a political opinion? Because it involves the government, it involves the – his general beliefs with regard to the human smuggling trade, and it is our position that that's political, because government officials in some – it's corrupt government officials who allowed this to happen to some extent. And in this case, there's an – there's a general acquiescence, and that's our belief that it's – it's political, Your Honors. You have about a minute left. Would you like to save it for rebuttal? Thank you. We'll hear from the government at this time. The Attorney General, excuse me, counsel. Mr. Fiorino? Good morning, members of the Court. I'm Paul Fiorino for the Respondent. I think, Judge Tashima, you hit on a very important point, the political opinion aspect of this. We don't think that the – that the evidence supports the finding of political opinion at all. Petitioner claims that he was a victim of the smugglers, yet he willfully put himself in their hands, choosing, instead of a lawful entry in the United States, to evade the law and do so in an illegal way. And when he got caught, all of a sudden he says that he has a political opinion against the very activity that he participated in. And we think that that borders on frivolous, actually. It simply is not supported by the evidence of the record. Whatever rises to the standards for asylum, withholding, or even cap relief, why would the United States government want to send back a cooperating informant into a country where there's some probability he might be killed? Because he's here illegally. He broke the law. He has no basis to be here. We don't think that the evidence supports the conclusion that he'd be likely to be killed, because we don't think that there's any evidence that – well, he certainly doesn't have any valid claim for asylum. The people that are interested in him – I think they focus primarily on Kat. Kat. Okay, well, let's look at Kat. So if you had a situation where there was a member of Al-Qaeda smuggled into the country, into, say, New Jersey, and he has an unrelated encounter with federal law enforcement, and he offers to identify the members of an Al-Qaeda sleeper cell planning an attack inside the Saudi Arabia, Afghanistan, Pakistan, wherever, he would be killed because they would know that he testified against the people in the sleeper cell the country would send him back. That's a different situation, because that person staying in the United States providing evidence about terrorism is – Is that what this guy did? What's that? Didn't he provide help? Yeah, about one single smuggling operation. He doesn't open a window – As a matter of consequence, if it's just one smuggler of human beings versus a terrorist sleeper cell, that's different? I don't think that it's that simple, but we would say that there's no provision in the law that would excuse – that would excuse a deportation based on providing criminal evidence. I mean – Did you find that reason for my hypothetical? Yes. I mean – And what is that reason? The reason for the – Yeah, and under my hypothetical, why would you not deport the cooperating Al-Qaeda member? Because I'm making the assumption that his testimony would be continuing and ongoing to prevent future terrorist attacks. Well, he's just going to testify once.  He's going to identify the members of the cell, talk about the discussions they had to attack the fuel tanks at John F. Kennedy Airport in New York, and that – but that's all he knows about, and how he got into the country, how they sneaked him into the country. That's all he's going to testify about. Well, I think that – He doesn't know anything else. I think that there are other statutes relating to terrorists that would make it very difficult for us to release him or at least – or to parole him or to allow him to stay. Other statutes. Your Honor, I apologize. There are – You're just guessing. No, I'm not guessing. There are – You know there are other statutes. Yes. You're just guessing that they afford some protection for this witness. I don't know 100 percent, yes, Your Honor. But I would suspect that's the – Before I interrupted you with my question, you were talking about political opinion. Yes. Well, I think I've pretty much covered that political opinion is not indicated here. We think that it's certainly not – He's a victim of his own activity. It's not a political opinion at all. If you've covered that, what about responding to Ms. Reynolds' attack on the IJ's methodology under the Cat claim? To be honest, I don't see where the immigration judge made any mistake there. He certainly articulated the basis for showing acquiescence. She – I'm sorry. I apologize. She certainly articulated the basis for discussing acquiescence. She said that specific knowledge is not required and awareness is required. In other words, she acknowledged that there is some lesser quantum of knowledge required to which – that you would ignore to show acquiescence. But when she talks about the specificity, I think what she was talking about was the fact that there was nothing in the record to show that this particular individual, the petitioner herein, would have any probability of being tortured. Doesn't that fly right in the face of Ging v. Ashcroft? No, I don't think so, Your Honor, because I think that to show protection – to get protection under the Convention Against Torture, you can't show that torture exists in the country in some generalized sense. You still have to show that you are. Isn't that exactly what Ging says? That it's not correct to force a petitioner to prove that the – to this particular petitioner's possible harm if returned. No, I misspoke, Your Honor. I think that he would have to show – it's not the Brazilian government looking at him. It's whether he would be likely to be tortured. And I think I may have misunderstood the point. I think, yes, you know, you can't show that the Brazilian government – you wouldn't need to show that the Brazilian government would specifically ignore him. But to even get there, you have to show that he specifically would be likely to be tortured. Well, that's what his testimony was. We don't think that the record – that evidence compels that conclusion because the evidence in the record talks about the corrupt police in Brazil. He didn't exhaust his remedies with respect to the police. He didn't report these threats that he had. He didn't give them to the government. Now, granted, a lot of this happened while he was in the United States. But he really hasn't shown that the Brazilian government would be uninterested in protecting him. It's all speculation, we think. And we don't think that the evidence compels the conclusion that he is more likely than not to be tortured. Was there evidence of threats to his family after he testified? Threats to his family, yes. In Brazil. In Brazil. There's also evidence of a threat – He says, this is what the government does. They do nothing. Police are corrupt, et cetera. He says. Yes. And he says, as evidence of this, I've now learned that my family's been threatened down in Brazil. Was there any contrary evidence? Yes. There's evidence from a man named Carlos who says, if you rat us out, I live in San Francisco and I can find you and I'm going to hurt you. And to my knowledge, that hasn't happened. So I don't think that – I don't – moreover, I don't think that there's an express linkage between the attacks on the family in Brazil. What does San Francisco have to do with what goes on in Brazil? Because it shows the reach and effectiveness and the willingness of these people to hurt him. Doesn't that support the claim? The fact that he wasn't hurt here? No. That there's somebody that the criminal enterprise in Brazil can reach out to to do harm? What I'm saying is that the individual here, the claimant is the petitioner. He's the one who says that he's going to get hurt. So you think he has to get hurt in the United States before he meets his burden? No. But I think – That's kind of what you're saying, really. It is – yeah. It is what you're saying. I think – If I may finish, it shows the weakness of the likelihood of this evidence. Why? Because – He gets a threat in the United States. He gets instructions from a foreign country. Why is it not enough to show that they're – that that group in a foreign country is deadly serious about this stuff? I don't think – I don't understand why the petitioner has to be hurt before that's credible. Yes. That is – You're the one who brought up Carlos as a – as something that supports the government's position. Yeah. What I mean to illustrate by that is that the link between what he says he happened to and what the threat is and their actual ability to carry it out, we don't think it's that strong. And that's why we don't think the record compels the conclusion that he would be tortured if he was in Brazil. Let me return to political opinion for just a minute. How do you distinguish this case from the cases like Borja and Brijones where we had – it was a guerrilla group in the Philippines that the government was allegedly unable to control. Guerrilla group tries to recruit, points a gun in somebody's face. And we said, well, that's enough because that's resistant to a group that the government is not willing or able to control. That's exactly what it is. It's a political opinion. She said, I don't want to be a part of your group. I don't believe in your politics. I'm not going to give you money. Here's a guy saying that, you know, oh, I took part in your criminal enterprise and you hurt me, so all of a sudden now I'm politically opposed to the crime that I participated in. I think – I don't think that – I think it's very different, Your Honor. Maybe different in terms of the type of statement made, but how is it different theoretically? Because you have a group allegedly that the Brazilian government is unable or unwilling to control. And he's saying, I'm expressing this. It may be weak testimony, but it's – he says, I'm expressing an anti-mafia point of view. What's the qualitative difference between that and saying that it's on an anti-guerrilla point of view? Because the same argument – It's purely self-serving. Well, so that was the argument in Borja and Brujones, too. Both of those – No, I mean, her unwillingness to participate in a terrorist organization was not – did not defend her anything that she was doing illegal. I mean, here's a guy who participates – and I see that my time is up. You can answer the question. A man who decides to break the law, and he goes through with it, and because it doesn't go the way he wants, he says, oh, I'm sorry, I'm politically opposed to this now. I just think that's very self-serving. I don't – you could make the same argument, I guess, in other criminal enterprises. Suppose he was caught participating in drug smuggling, and he – as a result of that conviction, he's now deportable, and he testifies against his cohorts. And the cohorts in his native country threaten him, you know, because you ratted us out. And he says, well, now you can't deport me because I manifested a political opinion by testifying against my fellow dope dealers. We think that it stretches the concept of political opinion and asylum a little bit too far in this case. Okay. Thank you for your argument. Rebuttal? Yeah, I'll keep this brief. First of all, his political belief is that human smugglers should not be allowed to operate with impunity, and that's based in part on what he saw during the process during which he was smuggled into the country. There's no requirement of when political opinions must be formed. So there's no requirement that before entering the U.S. about the high probability of him being killed. It wasn't really an issue with the court. He was found to be credible by the IG, and, you know, government's bringing up this argument now. But also how he's different from other people who are smuggling in. This is a smuggling ring that brought clients from Brazil through Mexico to the United States. So it's not, you know, Juan that, you know, drives his pickup across with two people in his car. This is a large ring that he's providing information against. Do Your Honors have any further questions for me? I don't hear any. Thank you for your argument. Thank both sides for the argument. Thank you very much for your time. You're welcome. The case to start will be submitted for decision.
judges: Hawkins, Tashima, Thomas